# EXHIBIT 23

ORIGINAL

| | |
|---|---|
| IBN WILLIAMS, | IN THE |
| *Plaintiff*, | CIRCUIT COURT |
| v. | FOR |
| COPPIN STATE UNIVERSITY, *et al.*, | BALTIMORE CITY |
| *Defendants*. | No. 24-C-22-004662 |

**PLAINTIFF IBN WILLIAMS' MEMORANDUM IN OPPOSITITION TO UNIVERSITY DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR A HEARING**

ORIGINAL

| | |
|---|---|
| IBN WILLIAMS, | IN THE |
| *Plaintiff,* | CIRCUIT COURT |
| v. | FOR |
| COPPIN STATE UNIVERSITY, *et al.,* | BALTIMORE CITY |
| *Defendants.* | No. 24-C-22-004662 |

**PLAINTIFF IBN WILLIAMS' MEMORANDUM IN OPPOSITITION TO
UNIVERSITY DEFENDANTS' MOTION TO DISMISS
AND REQUEST FOR A HEARING**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

FACTS ALLEGED ............................................................................. 2

LEGAL STANDARD .......................................................................... 7

ARGUMENT ...................................................................................... 8

   I.  DIXON AND CARTER ARE NOT IMMUNE BECAUSE THE FACTS ALLEGED SUPPORT A FINDING OF MALICE OR GROSS NEGLIGENCE. ...................................................................8

   II.  THE FACTS ALLEGED DO NOT ESTABLISH THE UNIVERSITY DEFENDANTS' IMMUNITY FROM BREACH OF CONTRACT. .........11

    A.  There is no basis to conclude from the Complaint that the contract was not written and signed.....................................................................11

    B.  There is no basis to conclude from the Complaint that the contract was not breached within one-year of the filing deadline. ........................................... 13

   III. THE COMPLAINT SUFFICIENTLY PLEADS NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND NEGLIGENT HIRING AND RETENTION BY THE UNIVERSITY DEFENDANTS. ....................................................................16

    A.  The University System and State are proper Defendants because they are employers of Dixon and Carter...................................................... 16

    B.  Count 4, however titled, sufficiently pleads intentional infliction of emotional distress. ........................................................................ 18

    C.  The Complaint sufficiently pleads negligence by the University Defendants................................................................................... 20

      1.  University Defendants owed Williams the duty a business owner owes to an invitee and the duty to control their employee. .................................. 21

        a.  The University Defendants owed Williams the same duty a business owner owes to an invitee....................................................................... 22

        b.  The University Defendants also had a duty to control their employee, Brownlee. ................................................................................... 27

2.    The Complaint's allegation that Brownlee's history was known to the University Defendants supports causation.................................................. 29

D.   The Complaint sufficiently pleads negligent hiring and retention.......... 30

IV. THE COURT SHOULD GRANT LEAVE TO AMEND TO ALLOW WILLIAMS TO CURE ANY DEFICIENCIES. .........................................32

CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abrishamian v. Washington Med. Grp., P.C.*,
   216 Md. App. 386 (2014)............................................................................... 24, 25

*Alban v. Fiels*,
   210 Md. App. 1 (2013).......................................................................................... 18

*Barbre v. Pope*,
   402 Md. 157 (2007) ................................................................................... 9, 10, 11

*Barclay v. Briscoe*,
   427 Md. 270 (2012) ............................................................................... 17, 21, 28

*Cooper v. Rodriguez*,
   443 Md. 680 (2015) ............................................................................................... 9

*Corapcioglu v. Roosevelt*,
   170 Md. App. 572 (2006)..................................................................................... 20

*Ellerin v. Fairfax Sav., F.S.B.*,
   337 Md. 216 (1995) ............................................................................................. 15

*Est. of Alcalde v. Deaton Specialty Hosp. Home, Inc.*,
   133 F. Supp. 2d 702 (D. Md. 2001) .............................................................. 19, 20

*Faya v. Almaraz*,
   329 Md. 435 (1993) ............................................................................................. 25

*Fitzgerald v. Bell*,
   246 Md. App. 69 (2020)....................................................................................... 15

*Floyd v. Mayor & City Council of Baltimore*,
   463 Md. 226 (2019) ............................................................................................... 8

*Hamilton v. Ford Motor Credit Co.*,
   66 Md. App. 46 (1986)......................................................................................... 18

*Hancock v. Mayor & City Council of Baltimore*,
   480 Md. 588, (2022) ............................................................................................ 21

*Hulbert v. Pope*,
   535 F. Supp. 3d 431 (D. Md. 2021) .................................................................. 8, 9

*Johnson v. State*,
   894 P.2d 1366 (Wash. Ct. App. 1995)................................................................ 22

*Lasater v. Guttmann*,
   194 Md. App. 431 (2010)..................................................................... 18, 19, 20

*Litz v. Md. Dept. of Env't*,
   434 Md. 623 (2013) ........................................................................... 13, 14, 15

*Murphy-Taylor v. Hofmann*,
   968 F. Supp. 2d 693 (D. Md. 2013) .................................................................. 10

*Newell v. Runnels*,
   407 Md. 578 (2009) ......................................................................................... 9

*Perry v. Asphalt & Concrete Servs., Inc.*,
   447 Md. 31 (2016) ..................................................................................... 21, 31

*Pittway Corp. v. Collins*,
   409 Md. 218 (2009) ................................................................................... 7, 25

*Rhaney v. Univ. Of Maryland E. Shore*,
   388 Md. 585 (2005) ............................................................................. 22, 26, 27

*RRC Ne., LLC v. BAA Maryland, Inc.*,
   413 Md. 638 (2010) ........................................................................................ 32

*S. Mgmt. Corp. v. Taha*,
   378 Md. 461 (2003) ........................................................................................ 17

*Southland Corp. v. Griffith*,
   332 Md. 704 (1993) ................................................................................... 21, 26

*State v. Jones*,
   197 Md. App. 638 (2011)................................................................................ 31

*Stern v. Bd. of Regents, Univ. Sys. of Maryland*,
   380 Md. 691 (2004) ........................................................................................ 12

*Tabor v. Baltimore City Pub. Sch.*,
   138 Md. App. 747 (2001)................................................................... 33

*Taylor v. NationsBank, N.A.*,
   365 Md. 166 (2001) ....................................................................... 12

*Troxel v. Iguana Cantina, LLC*,
   201 Md. App. 476 (2011)............................................................ 21, 26

*Univ. Sys. of Maryland v. Baltimore Sun Co.*,
   381 Md. 79 (2004) ......................................................................... 17

<u>Statutes</u>

Md. Code Ann., Educ. § 12-101 .......................................................... 17

Md. Code Ann., State Gov't § 12-105 ................................................... 8

Md. Code Ann., State Gov't § 12-201 ......................................... 11, 12, 13

Md. Code Ann., State Gov't § 12-202 ......................................... 13, 14, 15

Md. Code Ann., Cts. & Jud. Proc § 5-522 .............................................. 8

<u>Rules</u>

Md. Rule 2-303 .............................................................................. 20

Md. Rule 2-341 .............................................................................. 33

Md. Rule 5-201 .............................................................................. 24

<u>Other Authorities</u>

Robert N. Davis, *The Courts and Athletic Scholarships*,
   67 N.D. L. Rev. 163 (1991) ............................................................ 13

## MEMORANDUM IN OPPOSITION
## TO UNIVERSITY DEFENDANTS' MOTION TO DISMISS

Plaintiff Ibn Williams, through undersigned counsel, submits this opposition to the Motion to Dismiss filed by Defendants Coppin State University ("Coppin State" or "University"), the University System of Maryland ("University System"), the State of Maryland ("State"), Derek Carter, and Juan Dixon (collectively, "University Defendants"), and in support states as follows:

### INTRODUCTION

As alleged in the Complaint, Coppin State successfully recruited Williams to play basketball for the University by promising him, among other things, a safe environment and financial assistance.  Both promises were broken.  Soon after Williams arrived on campus, and for the next two years, Williams was tormented by a blackmailer who threatened to publicize sexually explicit images of him unless he agreed to the blackmailer's depraved demands, which included having unwanted sexual encounters with an assistant coach, Defendant Lucien Brownlee.

Brownlee, upon information and belief, *was* the blackmailer, and his employers and supervisors—the University Defendants—*knew* that Brownlee was a danger to Williams and the other players on the team.  Yet, they still retained him as a coach, maintained no oversight as to his relationships or relations with the student athletes, and did nothing to prevent him from victimizing Williams.  When Williams asked the University to investigate the situation, it retaliated by

terminating his financial assistance without cause. The experience at Coppin State left Williams with deep emotional and financial injuries.

These facts, if proved, state claims against the University Defendants for negligence (Count 1), negligent hiring and retention (Count 2), intentional infliction of emotional distress (Count 4), and breach of contract (Count 5). The University Defendants' bid to avoid accountability relies on misguided claims of immunity and turning a blind eye to the Complaint's most damaging allegations. The Court should therefore deny the University Defendants' Motion to Dismiss in its entirety.

## FACTS ALLEGED

Williams was recruited to play basketball at Coppin State. Compl. ¶ 11. As part of the recruitment, the University promised Williams and his family that it would provide him a safe environment, free from drugs, abuse, and violence. *Id.* ¶ 14. Williams also was promised financial assistance for tuition and housing. *Id.* ¶ 68. The University's recruitment pitch succeeded. Williams enrolled in fall 2018 and became a member of the men's basketball team. *Id.* ¶ 10; *see id.* ¶ 21(a).[1] But the promises that brought Williams to Coppin State soon proved to be false.

In Williams' first semester, he was contacted through social media by a person purporting to be a young woman interested in a romantic relationship with him. *Id.* ¶ 15. The apparent paramour enticed Williams into sending sexually

---

[1]    The Complaint inadvertently repeats paragraphs 21, 22, 32, and 35. This brief distinguishes between the initial and repeated paragraph numbers using the designations "(a)" and "(b)," respectively.

explicit images, which Williams believed were private. *Id.* ¶ 16. Williams then learned that he was the victim of a ruse. *Id.* ¶ 17. The young woman was a fabrication. *Id.* Williams had sent the images to an unknown individual that proceeded to blackmail him ("blackmailer"). *Id.* The blackmailer demanded that Williams submit to a series of depraved demands or suffer the humiliation and shame of the publication of these images and messages to his teammates and the public. *Id.* ¶¶ 19–20. Williams feared that disclosure of the material would destroy his reputation and basketball career at Coppin State and cause devastating irreparable shame and harm to him and his family. *Id.* ¶ 20.

The blackmailer's harassment of Williams escalated during the spring 2019 semester with demands for more salacious content. *Id.* ¶ 21(a). Williams continued to respond, fearing that if he failed to do so, he would lose his place in the basketball program and lose the tuition, room, and board promised to him by the University Defendants. *Id.* ¶ 22(a).

Near the end of the spring 2019 semester, Williams was told that another member of the Coppin State basketball program had sent explicit material to the blackmailer. *Id.* ¶ 21(b). Defendant Lucien Brownlee, then a coach and Director of Player Development for the Coppin State basketball team, had become acquainted with Williams and "appeared to express an interest in [his] progress and continuing success" as a basketball player at Coppin State. *Id.* ¶ 23. Brownlee revealed to Williams that he too had sent sexual content to the blackmailer. *Id.* ¶ 22(b). In a bizarre (and perhaps not coincidental) twist, this revelation was followed by a

demand from the blackmailer that Williams engage in sexual encounters with Brownlee. *Id.* ¶ 24. Williams resisted. *Id.*

In the fall 2019 semester, the threats and demands further escalated to a constant barrage. *Id.* ¶ 25. The blackmailer also continued to fixate on Brownlee. In November 2019, the blackmailer, showing an apparent knowledge of Williams' schedule and availability, demanded that he record and send a video of him engaging in oral sex with Brownlee. *Id.* ¶ 26. Brownlee insisted that Williams comply. *Id.* Facing the threat of exposure and the loss of his position in the basketball program and the accompanying financial support, Williams relented. *Id.*

Early the next month, around December 8, the blackmailer tried to arrange another sexual encounter between Williams and Brownlee. *Id.* ¶ 27. Williams ignored the blackmailer hoping he would be left alone. *Id.* But Williams' non-response served only to enrage the blackmailer, who warned that he would "wild out" if Williams continued to ignore him and refused to comply. *Id.* ¶ 28.

Following the early December demand, the blackmailer demanded more sexual videos. *Id.* ¶ 30. Williams sent the blackmailer a video of himself but the blackmailer rejected it as unsatisfactory. *Id.* ¶ 31. Instead, the blackmailer demanded a video of Williams having sex with Brownlee. *Id.* ¶ 32(a). To that end, the blackmailer repeatedly sent Williams messages with Brownlee's availability. *Id.* ¶ 32(b). If Brownlee was not the blackmailer, then by sharing his availability to sexually assault Williams, it is clear that he was at the very least cooperating with the blackmailer at Williams expense.

4

Williams became hopeless and believed the harassment would never end. *Id.* ¶ 33. In March 2020, Williams told the blackmailer as much in response to yet another demand. *Id.* A brief five-day respite followed, after which the blackmailer renewed his demands for a video of Williams engaging in a sexual act with someone of the same sex. *Id.* ¶ 34.

Williams began having suicidal thoughts and knew he needed to find a way to escape the blackmailer. *Id.* ¶ 35(a). Williams was too ashamed to tell his family of the blackmail, so he instead truthfully informed them of his concerns regarding "blatant, unchecked use of illegal drugs and inappropriate behavior" by members of the Coppin State basketball program during travel for away games. *Id.* Williams hoped the revelation would spur a transfer to a different program. *Id.*

In June 2020, Williams and his father met with Head Coach Juan Dixon to discuss the program's drug issues and Williams' possible transfer. *Id.* ¶ 35(b); *see id.* ¶ 43. Dixon told them that player drug use was inevitable and that he was helpless to meaningfully address it, but he was adamant that Williams should stay with the program. *Id.* ¶ 35(b). Williams, after being assured by Dixon that his financial support and other benefits would continue, decided to remain a member of the Coppin State team. *Id.*

By the fall 2020 semester, the disruption caused by the COVID-19 pandemic was over and Williams returned to the University and its basketball program. *Id.* ¶¶ 36, 37. The blackmailer returned as well, once again making demands of Williams. *Id.* ¶ 37. When Williams refused to respond, the blackmailer made good on his

5

threats and published material from Williams to the basketball team, staff, and public. *Id.* ¶ 37.

Dixon directed Williams to attend practice the next day, at which time he met personally with Williams. *Id.* ¶ 38. Dixon admitted to Williams that Brownlee was "mentally ill or emotionally imbalanced and that his history was known" to Dixon, Coppin State Athletic Director Derek Carter, and the University more generally. *Id.* ¶ 38; *see id.* ¶ 43.

Later that night, in a phone call with Williams' brother and father, Dixon "confirmed" his knowledge of Brownlee's "instability" and acknowledged that Brownlee was "'sick' and had a troubled background." *Id.* ¶ 39. Yet, despite "full knowledge" of Brownlee's conduct, neither Dixon nor any other University Defendant did anything to monitor Brownlee's interaction with Williams or any other student athletes, or to prevent Brownlee's inappropriate interaction with and torment of Williams. *Id.* ¶ 40.

Williams hoped the University would address the situation and asked that it investigate the harassment, sexual assault, and blackmail he had endured. *Id.* ¶ 41. Instead of getting to the bottom of the matter, the University further harmed Williams. *See id.* ¶ 42. In violation of the controlling guidelines and standards, Williams, a sexual assault victim, was improperly questioned about past sexual encounters and his sexual orientation. *Id.*

Though Dixon, Carter, and others in positions of authority at Coppin State knew that Brownlee was unfit to hold a position of authority or supervisory role

over student-athletes, they nonetheless hired and retained him as coach and Director of Player Development for the men's basketball team. *Id.* ¶ 43.

Dixon, Carter, and Coppin State failed to comply with State and internal reporting requirements, and Defendants, collectively, failed to provide to Williams a safe, suitable environment free from violence, harassment, and drug abuse. *Id.* ¶ 44.

Finally, Dixon, Carter, Coppin State, and the University System failed to follow NCAA guidelines and their own policies regarding the financial, emotional, and physical well-being of Williams. *Id.* ¶ 45. After Williams notified the University that he was the victim of sexual assault and harassment and formally demanded an investigation, Coppin State, through its agents, servants, and employees retaliated against Williams by terminating, without cause, the housing and tuition assistance previously promised and provided. *Id.*

## LEGAL STANDARD

A motion to dismiss for failure to state a claim should be denied if the complaint on its face describes a legally sufficient cause of action. *Pittway Corp. v. Collins*, 409 Md. 218, 234 (2009). In making this determination, a court "must assume the truth of all well-pleaded facts and allegations in the complaint, as well as all inferences that can reasonably be drawn from them." *Id.* at 239 (citation and internal quotation marks omitted). The court also "must view all well-pleaded facts and the inferences from those facts in a light most favorable to the plaintiff." *Id.* (citation omitted). Facts outside the complaint and any non-incorporated exhibits

7

generally are not considered. *See Floyd v. Mayor & City Council of Baltimore*, 463 Md. 226, 241 (2019).

## ARGUMENT

I.    DIXON AND CARTER ARE NOT IMMUNE BECAUSE THE FACTS ALLEGED SUPPORT A FINDING OF MALICE OR GROSS NEGLIGENCE.

The University Defendants first argue that Carter and Dixon should be dismissed as defendants because they are immune from suit under the Maryland Tort Claims Act ("MTCA"). Memorandum of Law in Support of the University Defendants' Motion to Dismiss ("Memo") at 7. Because the Complaint sufficiently alleges that Carter and Dixon acted with malice or gross negligence, their dismissal is unwarranted.

Section 12-105 of the State Government Article specifies that "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article" ("Courts Article"). Md. Code Ann., State Gov't § 12-105. Section 5-522(b) of the Courts Article, in turn, immunizes "State personnel" from "suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is *made without malice or gross negligence*." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (emphasis added).

As the statutory language indicates, State personnel are not immune from malicious or grossly negligent tortious acts or omissions. *See Hulbert v. Pope*, 535 F. Supp. 3d 431, 455 (D. Md. 2021). Malice consists of an "'evil or wrongful

8

motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Id.* (quoting *Barbre v. Pope*, 402 Md. 157, 182 (2007)). "Gross negligence is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another,' and 'implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Id.* (quoting *Cooper v. Rodriguez*, 443 Md. 680, 708 (2015)).

Malice and gross negligence are "amorphous concepts." *Newell v. Runnels*, 407 Md. 578, 636 (2009). Thus, the Supreme Court of Maryland "has recognized consistently that the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact." *Id.* (citing cases).

This case is no exception. The Complaint alleges that after the blackmailer publicized the explicit material sent to him by Williams, Dixon, in a personal meeting with Williams, admitted that Brownlee "was mentally ill or otherwise emotionally imbalanced and his history was known to [Dixon], [Athletic Director] Carter and [Coppin State]." Compl. ¶ 38. The Complaint further alleges that Dixon confirmed his knowledge of Brownlee's "instability," "sick[ness]," and "troubled background" in a call with Williams' brother and father later that same day. *Id.* ¶ 40.

These allegations, coupled with those establishing that Brownlee was the blackmailer (discussed in more detail *infra*), permit an inference that Carter and Dixon knew that one of their coaches was harassing and sexually assaulting a student-athlete and did nothing about it. Indeed, the Complaint expressly alleges that "Defendants with full knowledge of the previously described events [*i.e.*, the

harassment and sexual assault of Williams], took no action to address that their Director of Basketball Operations and Assistant Coach [Brownlee] had victimized [Williams] in this manner." *Id.* ¶ 41.  These facts, if proved, would support at least a finding of gross negligence by Dixon and Carter as their failure to act would amount to "a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre*, 402 Md. at 187 (citation omitted).

The University Defendants argue that merely because Williams' tort claims sound in negligence and contract, they are "the very type of non-malicious conduct" for which Carter and Dixon retain immunity.  Memo at 8.  To the extent the University Defendants suggest that State personnel enjoy blanket immunity from negligence-based claims they are wrong.

In *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693 (D. Md. 2013), an employee of a county sheriff's office brought federal and state claims, including negligence, against her superiors and other defendants for workplace sexual harassment. *Id.* at 703.  The federal district court refused to dismiss the individual defendants as immune under the MTCA because the complaint sufficiently alleged gross negligence.  According to the complaint, the plaintiff complained to her superiors about the harassment, but they did nothing about it. *Id.* at 739.  "These allegations, if credited by a fact-finder, could support a finding that [the plaintiff's superiors] were grossly negligent." *Id.*

Here, too, the allegations that Dixon and Carter knew of Brownlee's harassment and sexual assault of Williams but did nothing in response could support

a finding of gross negligence.  The tort claims against them (Counts 1, 2, and 4) should therefore be allowed to proceed. If the Court requires that the complaint be more specifically plead to allege "gross" negligence or malice that is easily rectified and will avoid a draconian result that overlooks the interests of justice.

As for breach of contract (Count 5), to the extent malice or gross negligence is required, the Complaint alleges that Williams' financial assistance was withdrawn in retaliation for his investigation request.  Compl. ¶ 45.  That type of "evil or wrongful motive, intent to injure, [and] knowing and deliberate wrongdoing" is textbook malice. *See Barbre*, 402 Md. at 187.  Thus, Dixon and Carter should remain defendants for the breach of contract claim as well.

II.     THE FACTS ALLEGED DO NOT ESTABLISH THE UNIVERSITY DEFENDANTS' IMMUNITY FROM BREACH OF CONTRACT.

Next, the University Defendants collectively claim immunity from Williams' breach of contract claim, because, according to them, the claim is not based on a written contract and does not meet the one-year filing deadline.  Memo at 9 (citing State Gov't §§ 12-201(a), 12-202).  Those arguments should be rejected because they are not supported by the facts alleged in the Complaint.

### A.     There is no basis to conclude from the Complaint that the contract was not written and signed.

Section 12-201(a) of the State Government Article prohibits "units" of the State from raising a sovereign immunity defense to a breach of contract action in State court "based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of

11

the authority of the official or employee." State Gov't § 12-201. The Supreme Court of Maryland has interpreted this statute to mean that the contract must be "reduced to writing" and "signed by a State official with proper authority." *Stern v. Bd. of Regents, Univ. Sys. of Maryland*, 380 Md. 691, 721, 723 (2004) (citation and internal quotation marks omitted).

Though these are requirements for a waiver of sovereign immunity, they are not pleading requirements for a breach of contract claim. Rather, "to state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). Thus, to state a claim for breach of contract, the Complaint did not need to specify that the contract was written and signed.

The University Defendants read the Complaint's references to the "promises" and "assurances" made to Williams as consisting of *oral* representations (Memo at 11), but nowhere does the Complaint say that. On the contrary, the Complaint refers to the Defendants as having "violated express terms of their agreement," thus indicating a written contract. At this stage, the Court must draw inferences in favor of the Williams, not the University Defendants.

As to the University Defendants further argument that there was "no contract at all" (Memo at 10), the Complaint plainly states that financial assistance for tuition and housing was promised as part of Williams' recruitment to play basketball for Coppin State. Compl. ¶ 68. Williams accepted that offer by going to Coppin State

to play basketball, thus forming a contract.  As one commentator has explained, "[t]he financial aid agreement is the offer from the institution to pay for the student-athlete's tuition and fees, and room and board.  The value of the scholarship is the consideration.  The student-athlete accepts the offer and, in return, promises to give the institution his or her athletic ability for a period of time . . . ."  Robert N. Davis, *The Courts and Athletic Scholarships*, 67 N.D. L. Rev. 163, 165–66 (1991).

Aside from the inferences that must be drawn in favor of Williams, it defies logic to think that Coppin State, a State University recruited and provided a scholarship to a member of its basketball team without a signed agreement.

Because the Complaint sufficiently pleads the existence of a contract and its breach, and the factual inferences and basic logic dictate that the contract was in writing and signed, dismissal of the breach of contract claim under State Government § 12-201(a) without any discovery would be premature.

### B.    There is no basis to conclude from the Complaint that the contract was not breached within one-year of the filing deadline.

Section 12-202 of the State Government Article imposes an additional limitation on breach of contract claims against a unit of the State, requiring that the plaintiff file suit "within 1 year after the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim."  State Gov't § 12-202.   "When it is necessary to make a factual determination to identify the date of accrual, . . . those factual determinations are generally made by the trier of fact, and not decided by the court as a matter of law."  *Litz v. Md. Dept. of Env't*, 434

Md. 623, 641 (2013). Thus, "a motion to dismiss ordinarily should not be granted by a trial court based on the assertion that the cause of action is barred by the statute of limitations unless it is clear from the facts and allegations on the face of the complaint that the statute of limitations has run." *Id.* (citing cases).

The University Defendants acknowledge that the Complaint does not establish an accrual date. *See* Memo at 12. They nonetheless speculate—based on facts they ask the Court to judicially notice[2]—that the latest possible date is May 13, 2021, and from there conclude that the breach of contract claim is untimely. But neither the Complaint on its face nor State Government Article § 12-202 supports this conclusion. The period for bringing suit expires on the *later* of the date on which the claim arose, or the completion of the contract that gives rise to the claim. The Complaint on its face does not establish either of these dates (and did not need to). To the extent the completion date for the contract was within one year of the date on which the suit was filed, a distinct possibility based on the timeline in the Complaint, the claim would be timely under § 12-202. *Cf. Litz*, 434 Md. at 646 ("The continuing harm or continuing violation doctrine tolls the statute of limitations in cases where there are continuing violations." (alterations and internal quotation marks omitted)).

In addition, issues related to the breach of contract were included in the Notice of Claim and the Title IX investigation requested by Williams. The State

---

[2]     Argument III.C.2 below explains why the University Defendants' requests for judicial notice are improper and should be denied.

was made aware of these allegations and should not be rewarded with purposefully delaying resolution of these complaints by staging a sham Title IX investigation and then claiming that Williams' claim is out of time. *Cf. Fitzgerald v. Bell*, 246 Md. App. 69, 89 (2020) ("[Maryland] courts recognize the 'continuation of events' theory, pursuant to which the statute of limitations may be tolled when a confidential or fiduciary relationship exists between the parties.").

In any event, because the Complaint on its face does not support a finding of untimeliness under § 12-202, dismissal on that basis is unwarranted. *See Litz*, 434 Md. at 641 (and cases cited therein).

Finally, to the extent the Court is inclined to grant dismissal of the breach of contract claim under § 12-202, the University Defendants' misrepresentations to Williams related to the promised financial assistance may give rise to a fraud-based claim or claims. *See, e.g., Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 230 (1995) ("[R]ecovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive."). Williams thus asks that if the Court dismisses Count 5, it grant him leave to amend both to address any deficiency in the breach of contract claim and add any additional claims based on the University Defendants' termination of his financial assistance. *See* Argument IV *infra*.

15

III.   THE   COMPLAINT   SUFFICIENTLY   PLEADS   NEGLIGENCE,
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND
NEGLIGENT HIRING AND RETENTION BY THE UNIVERSITY
DEFENDANTS.

The University Defendants further asks that the Court dismiss the tort claims

against them for failure to state a claim.  The Court should deny their request.

Addressing the University Defendants' arguments in the order presented: (A) the

University System and State are properly joined as defendants because they are co-

employers of Dixon and Carter; (B) Count 4 should be treated as stating a sufficient

claim for intentional infliction of emotional distress regardless of its title;

(C) Count 1 states a claim for negligence because the University, as a business

owner and employer, had a duty to protect Williams from known dangers and it

breached that duty, causing Williams harm; and (D) Count 2 states a claim for

negligent hiring and retention because the University Defendants knew of

Brownlee's "history" but hired or retained him as a coach anyway, causing harm to

Williams, a player under his charge.

### A.    The University System and State are proper Defendants because they are employers of Dixon and Carter.

The University Defendants "initial[ly]" argue that "all claims brought against

the State of Maryland and the University System of Maryland should be dismissed

because they are identical to, and duplicative of, the claims against the University."

Memo at 13.  The University Defendants' argument should be rejected because all

three entities are potentially liable as employers under the doctrine of *respondeat*

*superior*.

16

Maryland courts have "recognized consistently the doctrine of *respondeat superior*, as it is hornbook law that an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship." *Barclay v. Briscoe*, 427 Md. 270, 282 (2012) (citations and internal quotation marks omitted). The doctrine rests on the principle that "because the master holds out his servant as competent and fit to be trusted, he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment." *Id.* (citation, internal quotation marks, and alterations omitted). The application of *respondeat superior* is normally a jury question. *Id.*

The Complaint alleges that Dixon and Carter were at all relevant times employees, agents, or servants of Coppin State and the University System. Compl. ¶¶ 5, 6. The University System, which includes Coppin State, *id.* ¶ 3; *accord* Md. Code Ann., Educ. § 12-101(b)(6)(vi), is an "instrumentality of the State of Maryland." *Univ. Sys. of Maryland v. Baltimore Sun Co.*, 381 Md. 79, 89 (2004). Both Dixon and Carter are therefore "employees of the [S]tate of Maryland." *See id.* (referring to University of Maryland head football and basketball coaches). Thus, Coppin State, the University System, and the State, as the joint employers of Dixon and Carter, are all properly named defendants for the torts committed by their employees. *See S. Mgmt. Corp. v. Taha*, 378 Md. 461, 481 (2003) (noting "the settled principle of Maryland law that a worker may simultaneously be the employee of two employers" (citation and internal quotation marks omitted)).

17

**B.    Count 4, however titled, sufficiently pleads intentional infliction of emotional distress.**

Addressing Count 4, styled "Negligent Infliction of Emotional Distress," the University Defendants argue that "'Maryland does not recognize the tort of negligent infliction of emotional distress.'" Memo at 14 (quoting *Alban v. Fiels*, 210 Md. App. 1, 16 (2013)). That much is true, but because the Complaint adequately pleads *intentional* infliction of emotional distress by the University Defendants, Count 4 should not be dismissed.

As the Appellate Court of Maryland has explained, intentional infliction of emotional distress does not actually require intentional conduct:

> Despite the characterization of the tort as the *intentional* infliction of emotional distress, and notwithstanding the use of the adjective *intentional* in its title, the tort need not be *intentional*. The actor is responsible if the injury is inflicted by extreme and outrageous recklessness. Thus, provision for the negligent infliction of emotional distress is already made in the existing tort concept if that conduct amounts to extreme and outrageous recklessness.

*Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 63–64 (1986) (citation and internal quotation marks omitted); *see also Lasater v. Guttmann*, 194 Md. App. 431, 448 (2010) (listing four elements of intentional infliction of emotional distress: "(1) The conduct must be intentional *or reckless*; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." (citation, internal quotation marks, and alteration omitted) (emphasis added)).

18

The intentional or reckless element is satisfied if the defendant "either *desired* to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a *high degree of probability* that the emotional distress will follow." *Est. of Alcalde v. Deaton Specialty Hosp. Home, Inc.*, 133 F. Supp. 2d 702, 712 (D. Md. 2001) (citation and internal quotation marks omitted). Conduct is "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Lasater*, 194 Md. App. at 448 (citation and internal quotation marks omitted).

Though the tort "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct," *id.* at 450, this case fits that exceptional category. The Complaint's allegations and the reasonable inferences drawn therefrom, accepted as true, establish that Dixon and Carter were aware that Brownlee posed a palpable risk of inflicting egregious harm to their students and turned a blind eye to the fact that he was sexually assaulting a student athlete under his (and their) supervision.. *See, e.g.*, Compl. ¶¶ 24–32, 38–39. The Complaint further alleges that instead of seriously investigating the matter when Williams brought it to light, the University subjected him to improper interrogation and retaliated against him by terminating his tuition and housing assistance. *Id.* ¶ 42, 45. As a result of this experience, Williams "was seriously and permanently injured, suffered and will experience great pain and suffering, will be required to expend

19

large sums of money for medical care and attention, and has been and will be in the future disabled and prevented from attending to his necessary affairs and business." *Id.* ¶ 65.

These allegations, if proved, establish that the University and its employees at the very least "deliberate[ly] disregard[ed] . . . a high degree of probability" that Williams would suffer emotional distress. *See Alcalde*, 133 F. Supp. 2d at 712. They also establish conduct by the University and its employees that goes "beyond all possible bounds of decency" and is "utterly intolerable in a civilized community." *Lasater*, 194 Md. App. at 448 (citation and internal quotation marks omitted). Nor is there any question, based on the facts alleged, that the wrongful conduct caused Williams emotional distress that was severe.

The Maryland Rules specify that "[a]ll pleadings shall be so construed as to do substantial justice." Md. Rule 2-303(e). It is also "well established in Maryland law that a court is to treat a paper filed by a party according to its substance, and not by its label." *Corapcioglu v. Roosevelt*, 170 Md. App. 572, 590 (2006). Court 4, however labeled, states a claim for intentional infliction of emotional distress and so should not be dismissed.

### C.   The Complaint sufficiently pleads negligence by the University Defendants.

A plaintiff proves negligence by showing "[1] the existence of a duty owed by a defendant to him (or to a class of which he is a part), [2] a breach of that duty, [3] a legally cognizable causal relationship between breach of duty and the harm

suffered, and [4] damages." *Perry v. Asphalt & Concrete Servs., Inc.*, 447 Md. 31, 51 (2016).   The University Defendants argue that Williams' negligence claim against them should be dismissed because they "had no duty to protect him from the blackmailer" and even if a duty existed, they did not breach it or cause Williams' injuries.   Memo at 15, 21.   These arguments fail because they ignore key factual allegations and the reasonable inferences drawn therefrom.

> 1.   *University Defendants owed Williams the duty a business owner owes to an invitee and the duty to control their employee.*

"A duty enforceable in tort . . . is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Hancock v. Mayor & City Council of Baltimore*, 480 Md. 588, 603–04, (2022) (citation and internal quotation marks omitted).   Typically, "a person has no legal duty to come to the aid of another in distress." *Southland Corp. v. Griffith*, 332 Md. 704, 716 (1993).   A duty may, however, "arise from a 'special relationship' between the parties."   Special relationships giving rise to duty to protect from known dangers include the relationship between a business owner and invitee and an employer and his employee while the employee is on the employer's property.   *See Barclay v. Briscoe*, 427 Md. 270, 296 (2012); *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 496 (2011).   Both relationships apply here.

> a.   The University Defendants owed Williams the same
> duty a business owner owes to an invitee.

As the University Defendants acknowledge (Memo at 15), Courts in
Maryland and other jurisdictions have analyzed the duty owed by a University to its
students while on campus as equivalent to the duty owed by business owner to an
invitee. *See Rhaney v. Univ. Of Maryland E. Shore*, 388 Md. 585, 602 (2005); *see
also Johnson v. State*, 894 P.2d 1366, 1370 n.21 (Wash. Ct. App. 1995) (collecting
cases). A business owner has an affirmative duty to invitees "to use reasonable and
ordinary care to keep the premises safe and to protect the invitee from injury caused
by an unreasonable risk which the invitee, by exercising ordinary care for his own
safety, will not discover." *Rhaney*, 388 Md. at 602. "Liability for breach of this
affirmative duty may arise from . . . dangers associated with employees or other
invitees when that business owner, as a reasonably prudent person should have
anticipated the possible occurrence and the probable results of such acts." *Id.*
(citation, internal quotation marks, and alteration omitted).

The University Defendants erroneously argue that the business invitee
standard does not apply here because Williams' "interactions with the blackmailer[]
occurred in 'private[]' via [Williams'] personal social media account, not on the
University campus or in relation to University activities." Memo at 15. The
Complaint establishes otherwise. The blackmailer's communications stretched over
two years, allegedly beginning during Williams' first semester in fall 2018 and
continuing into the fall 2020 semester. Compl. ¶¶ 15–37. During that entire period,

Williams was enrolled as a student at Coppin State and was a member of its men's basketball team. Compl. ¶ 2. Moreover, the Complaint indicates that the blackmail ceased during the pandemic shutdown and "break between semesters," but resumed when Williams returned to Coppin State University for the 2020 fall semester. *Id.* ¶¶ 36, 37. These allegations support a reasonable inference that the blackmail occurred while Williams was on campus.

That inference is further strengthened by the allegation that Brownlee, an assistant coach who had "express[ed] an interest in William's progress," was the blackmailer. Compl. ¶ 23, 29. The University Defendants contend that there are no factual allegations supporting the assertion that Brownlee was the blackmailer (Memo at 17), but that is incorrect. As detailed in the Complaint, Brownlee told Williams that he too had exchanged sexual content with the blackmailer, thus revealing his knowledge of Williams' private communications with the blackmailer. Compl. ¶ 22. The blackmailer then "ordered" Williams to engage in "sexual encounters" with Brownlee, who, as noted, had "express[ed] an interest" in Williams. *Id.* ¶¶ 23, 24. The blackmailer also showed "an apparent knowledge of [Williams'] schedule and availability"—consistent with an assistant coach—when he later "demanded" that Williams record and send a video of him having oral sex with Brownlee. *Id.* ¶ 26. That incident was then followed by further demands from the blackmailer that Williams have and record "sexual encounter[s]" with Brownlee, along with "repeated messages" from the blackmailer "providing Coach Brownlee's availability." *Id.* ¶¶ 27–32(b). Viewed collectively, and in the light most favorable

to Williams, these allegations readily support the assertion that Brownlee was the blackmailer.

The University Defendants' further argument that the Complaint "lacks sufficient allegations to show Mr. Brownlee was a University 'employee'" (Memo at 18) is also without merit.  The Complaint alleges that Brownlee was "[a]t all relevant times . . . an employee, agent or servant" of Coppin State and the University System and that Brownlee was specifically "engaged by Coppin State University as a coach and its Director of Player Development."  Compl. ¶¶ 4, 22.  The University Defendants offer no authority to support their contention that more is required to plead the existence of an employment relationship.  *See* Memo at 18.  Instead, they request that the Court take judicial notice of webpages purporting to show Brownlee's relationship to the Coppin State men's basketball team from 2018 to 2023.  *See* Memo at 2–4 & nn.4–5, 7.  The Court should reject the request.  Even if the Court takes judicial notice of these webpages, they support the Complaint's allegations—not the University Defendants' arguments of exculpation.

The roster and coaching staff of a college basketball team, as reflected on the team's webpage, are not facts either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Md. Rule 5-201(b) (stating criteria for facts capable of judicial notice); *cf. Abrishamian v. Washington Med. Grp., P.C.*, 216 Md. App. 386, 413 (2014) (collecting examples of facts capable of judicial notice).  Nor do the facts offered for judicial notice seek "to

place a complaint in context." *See Faya v. Almaraz*, 329 Md. 435, 444 (1993) (noting that, "to place the complaint in context," court "may take judicial notice of *additional* facts that are either matters of common knowledge or capable of certain verification" (emphasis added)).   Rather, the University Defendants ask the Court to judicially notice facts that at least in part *contradict* the allegations in the Complaint.   That is improper, particularly where the controlling standard requires the Court to accept the facts alleged in the Complaint as true.   *See, e.g.*, *Pittway*, *supra*, 409 Md. at 239; *see also Abrishamian*, 216 Md. App. at 415 (explaining that judicial notice applies to facts that are undisputed and "does not typically extend to facts relating specifically to the parties involved").

But, again, even if the Court takes judicial notice of Brownlee's relationship to the Coppin State men's basketball team as reflected on its website, the University Defendants would *still* owe a duty under the business invitee standard.   According to the website referenced by the University Defendants, Brownlee "was a fellow student-athlete on the University's basketball team through the spring 2019 semester" and became "Director of Player Development" during the fall 2019/spring 2020 season.   *See* Memo at 2–3 & nn. 4–5.   Brownlee was therefore either a fellow invitee or employee during the two-year period when the bulk of the harassment and sexual assault occurred.   *See* Compl. ¶¶ 15–33.   As noted, a business owner's "affirmative duty" to protect invitees extends to "dangers associated with *employees or other invitees* when that business owner, as a reasonably prudent person should have anticipated the possible occurrence and the probable results of

25

such acts." *Rhaney*, 388 Md. at 602 (citation, internal quotation marks, and alteration omitted).

Moreover, when a business invitee is in danger and the business has knowledge of the peril—as the University did here (*see* discussion *infra*)—the business owner has a duty to act regardless of the source of the danger. *See Southland Corp. v. Griffith*, 332 Md. 704, 719 (1993) ("[A]n employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided that the employee has knowledge of the injured invitee and the employee is not in the path of danger."). In other words, the University's duty remained even after Brownlee was no longer affiliated with the program.

Brownlee's status aside, the University Defendants suggest that they had no duty because the interactions with the blackmailer occurred "in private" (Memo at 19). But the proper question, as indicated above, is whether they "should have anticipated" Brownlee's conduct and its "probable results." *See id.*; *see also Troxel*, 201 Md. App. at 497 ("[A] duty is imposed on the landowner to prevent criminal conduct of a specific assailant if the landowner is aware of the violent tendencies of that particular assailant."). On this point, *Rhaney* offers a useful contrast.

In that case, a University of Maryland Eastern Shore ("UMES") student was assaulted by his roommate in their shared dorm room. *Rhaney*, 388 Md. at 589. UMES had no duty as a business owner to protect the student from an assault by his roommate because there was "no pattern of sufficient prior violence on [the

26

roommate's] part in circumstances similar to what ultimately happened to Rhaney [the assault victim]." 388 Md. at 603. Thus, UMES "could not be said to be responsible for reasonably foreseeing what happened and, therefore, to have a duty to forestall its occurrence or stand liable for the consequences." *Id.*

Here, conversely, the Complaint alleges that after the blackmail material was publicly released, Dixon, in a meeting with Williams, admitted that Brownlee "was mentally ill or otherwise emotionally imbalanced and that his history *was known* to [Dixon], [Athletic Director] Carter and [Coppin State]." Compl. ¶ 38 (emphasis added). Dixon then "confirmed" his knowledge of Brownlee's "instability," "sick[ness]," and "troubled background" in a call with Williams' family members that same day. *Id.* ¶ 39. Thus, under the facts alleged, and unlike UMES in *Rhaney*, the University Defendants here had "full knowledge" of Brownlee's misconduct and its consequences (*id.* ¶ 40) and therefore had a duty, as business owners, to protect Williams from him. *Id.* ¶ 40.

> b. The University Defendants also had a duty to control their employee, Brownlee.

While the University Defendants' duty as business owners does not depend on Brownlee's employment status, if the Court accepts the allegation in the Complaint that Brownlee was at all relevant times a Coppin State and University System employee, as it should, then his alleged employers *also* had a duty to exercise reasonable care to control Brownlee based on the employer-employee relationship.

Under the Restatement (Second) of Tort § 317, as quoted in *Barclay*, *supra*, 427 Md. 270, an employer "has a duty to exercise reasonable care so to control his [employee] while acting outside the scope of his employment as to prevent him from intentionally harming others" when the employee "is upon the premises in possession of the [employer]" and the employer "(i) knows or has reason to know that he has the ability to control his [employee], and (ii) knows or should know of the necessity and opportunity for exercising such control." *Id.* at 296.

As discussed, the allegations of persistent harassment by the blackmailer/Brownlee over two years while Williams was a student-athlete and Brownlee was his coach supports the inference that at least some of that harassment occurred on campus, i.e., the premises in possession of the employer. Additionally, Brownlee, as an assistant coach, was subject to the University Defendant's control while on campus, and, for reasons already discussed, the University Defendant's knew or should have known of the need to control him. For this reason, as well, the University Defendants' disclaimer of any duty should be rejected.

In addition, there is an inference—that should be viewed in the light most favorable to Williams—that a member of the coaching staff was the blackmailer. Even if the Court is not inclined to accept this inference, this member of the coaching staff engaged in sexual acts with Williams, coordinated his availability with the blackmailer to engage in sexual acts with Williams, and did not advise the coaching staff, the school or any of the other students that he was aware of an ongoing sexual blackmail against one of the University's students. This member of

28

the University Defendants' coaching staff did not advise any of the students—at any time—that he was aware of and participated in this blackmail.

While discovery is warranted to flesh out the extent of Brownlee's role, even the most modest possible connection to Williams sexual assault—that Brownlee was forced to engage in sexual assault with Williams—is gross negligence because as a member of the coaching staff he was required to advise and warn the coaching staff, University and the student body of the ongoing threat. The University Defendants cannot divorce themselves so cleanly from the actions and omissions of a member of their coaching staff.

        2.     *The Complaint's allegation that Brownlee's history was known to the University Defendants supports causation.*

On causation, the University Defendants again disregard the Complaint's unfavorable (to them) factual allegations, claiming, incorrectly, that the Complaint "is devoid of any facts from which it could be inferred that the University Defendants were on notice of the harassment." Memo at 21. As already discussed at length, the Complaint alleges that Dixon admitted to Williams that Brownlee's "history was known" to Dixon, Carter, and the University, and that the University Defendants, "with full knowledge of the [events detailed in the Complaint], took no action to address" Brownlee's victimization of Williams. Compl. ¶¶ 39–40.

Because the University Defendants' cabined reading of the Complaint is inconsistent with the facts alleged, their causation argument fails.

### D.    The Complaint sufficiently pleads negligent hiring and retention.

The University Defendants' final bid for dismissal of the negligent hiring and retention claim (Memo at 22) mostly relies on the same faulty arguments underpinning its request for dismissal of the negligence claim. The Complaint does not sufficiently plead negligent hiring and retention, according the University Defendants, "because the identity of the blackmailer is unknown," and even if established as Brownlee, the Complaint does not "sufficiently allege[] the existence of an employment relationship between Mr. Brownlee and the University, that Mr. Brownlee was incompetent or potentially dangerous, or that the University Defendants knew about any purported dangerous propensity of Mr. Brownlee." Memo at 22. As these points have already been addressed and refuted, Williams simply incorporates his previous argument here.[3]

The University Defendants one new argument specific to negligent hiring and retention is that the Complaint does not adequately plead causation because "there is no nexus between any purported employment relationship and Mr.

---

[3]    One additional observation is warranted: While the University Defendants insist that an employment relationship has not been established, they also ask the Court to take judicial notice of facts indicating that Brownlee *was a Coppin State employee*. *See* Memo at 3 & n.5. On this point, then, the University Defendants defeat their own argument.

Brownlee's access to [Williams]." Memo at 23. That argument fares no better than the others.

Causation for a negligent hiring and retention claim requires proof of "two links in the causal chain." *Perry*, *supra*, 447 Md. at 52. The plaintiff must first show that the employer's failure to undertake a reasonable inquiry resulted in the employee's hiring (or that employer retained the employee despite knowledge of his incompetence), and then must prove that the hiring (or retention) was the proximate cause of the plaintiff's injuries. *See id.*; *see also State v. Jones*, 197 Md. App. 638, 670 (2011), *rev'd on other grounds*, 425 Md. 1 (2012).

The first requirement is satisfied by the Complaint's allegation the "Dixon admitted to [Williams] that Lucien Brownlee was mentally ill or otherwise emotionally imbalanced and that his history was known to the [Dixon], Mr. Carter and the [University]." Compl. ¶ 38. If this information was known before Brownlee's hiring, the University Defendants are responsible for negligently hiring him to coach and interact on a personal and collegial level with students, and if it was learned afterwards, then they are responsible for negligent retention. Either way, the first link in the causal chain is satisfied.

As for proximate causation, the Complaint makes clear that Brownlee's harassment and sexual blackmail of Williams was facilitated by Brownlee's position as an assistant coach, which gave him the opportunity to regularly communicate with Williams, placed him a position of authority over Williams, and gave him

knowledge of Williams' schedule and availability. *See* Compl. ¶¶ 23, 26. The second link in the causal chain is therefore satisfied as well.

Finally, the Complaint's allegations support a finding that Coppin State also negligently hired and retained Dixon and Carter (until Dixon's recent termination), and it can easily be amended to include another count to that effect. As the Complaint alleges, among other incompetent and wrongful actions, Dixon and Carter allowed "blatant, unchecked use of illegal drugs and inappropriate behavior" and, as Dixon admitted to Williams and his father, felt powerless to curtail it. Compl. ¶¶ 35(a)–35(b). Dixon and Carter also allegedly withdrew Williams's financial assistance in retaliation for his request for an investigation of Brownlee's behavior and failed to comply with State and internal reporting requirements. *Id.* ¶¶ 44–45. This behavior was negligently overlooked by Coppin State in hiring Dixon and Carter and in retaining them in the face of their egregious actions against Williams. Accordingly, the negligent hiring and retention claim should not be dismissed.

IV.   THE COURT SHOULD GRANT LEAVE TO AMEND TO ALLOW WILLIAMS TO CURE ANY DEFICIENCIES.

The "well-established" rule in Maryland is "that leave to amend complaints should be granted freely to serve the ends of justice and that it is the rare situation in which a court should not grant leave to amend." *See, e.g., RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 673 (2010). "The liberal allowance of amendments is permitted in order to prevent the substantial justice of a cause from being defeated

32

by formal slips or slight variances." *Tabor v. Baltimore City Pub. Sch.*, 138 Md. App. 747, 753 (2001).    Thus, if the Court agrees with any of the University Defendants' arguments for dismissal, Williams requests leave to amend to cure the deficiency.    Given the egregious acts and omissions by the University Defendants described in the Complaint, their dismissal with prejudice would not serve the ends of justice.    *See* Md. Rule 2-341(c) ("Amendments shall be freely allowed when justice so permits.")

## CONCLUSION

For the foregoing reasons, the Court should deny the University Defendants' Motion to Dismiss, or alternatively, should grant leave to amend.

Dated: June 16, 2023

Daniel N. Epstein (*pro hac vice*)
EPSTEIN OSTROVE, LLC
200 Metroplex Drive, Suite 304
Edison, NJ 08817
T: (732) 828-8600
F: (732) 828-8601
d.epstein@epsteinostrove.com

Terence Davis (No. 1612130129)
Morgan & Morgan DC, PLLC
1901 Penn Avenue, N.W., Suite 300
Washington, D.C. 20006
T: (571) 357-7580
F: (571) 357-7606
tdavis@forthepeople.com

*Attorneys for Ibn Williams*

## REQUEST FOR A HEARING

Pursuant to Maryland Rule 2-311(f), Plaintiff requests a hearing on the University Defendants' Motion to Dismiss.

Daniel N. Epstein (*pro hac vice*)
EPSTEIN OSTROVE, LLC
200 Metroplex Drive, Suite 304
Edison, NJ 08817
T: (732) 828-8600
F: (732) 828-8601
d.epstein@epsteinostrove.com

Terence Davis (No. 1612130129)
Morgan & Morgan DC, PLLC
1901 Penn Avenue, N.W., Suite 300
Washington, D.C. 20006
T: (571) 357-7580
F: (571) 357-7606
tdavis@forthepeople.com

*Attorneys for Ibn Williams*

| IBN WILLIAMS, | IN THE |
|---|---|
| *Plaintiff,* | CIRCUIT COURT |
| v. | FOR |
| COPPIN STATE UNIVERSITY, *et al.,* | BALTIMORE CITY |
| *Defendants.* | No. 24-C-22-004662 |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Memorandum in Opposition to University Defendants' Motion to Dismiss and Request for a Hearing was served by sending a copy first-class mail, postage prepaid, to Ariel Lichterman, Assistant Attorney General, Office of the Attorney General, 200 St. Paul Place, 17th Floor, Baltimore, MD 21202.

Terence Davis (No. 1612130129)

*Attorney for Ibn Williams*

| | |
|---|---|
| IBN WILLIAMS, | IN THE |
| *Plaintiff,* | CIRCUIT COURT |
| v. | FOR |
| COPPIN STATE UNIVERSITY, *et al.,* | BALTIMORE CITY |
| *Defendants.* | No. 24-C-22-004662 |

## **PROPOSED ORDER**

Upon consider of the Motion to Dismiss ("Motion") filed by Defendants Coppin State University, the University System of Maryland, the State of Maryland, Derek Carter, and Juan Dixon, and the response thereto, it is this _____ day of _____ 2023, **ORDERED** that the Motion is **DENIED**.

_____
JUDGE
Circuit Court for Baltimore City